1
2
3
4

THE MAUL FIRM, P.C.
Anthony F. Maul (Cal. Bar No. 314188)
101 Broadway, Suite 3A
Oakland, CA 94607
Tel: (510) 496-4477
Fax: (929) 900-1710
afmaul@maulfirm.com

5
6
7
8

PSYCH-APPEAL, INC.
Meiram Bendat (Cal. Bar No. 198884)
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x 101
Fax: (888) 975-1957
mbendat@psych-appeal.com

9    *Attorneys for Plaintiffs*

10
11
12

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

13
14
15
16
17
18

SARAH TAYLOR, on her own behalf,

Plaintiff,

v.

UNITED BEHAVIORAL HEALTH and
UNITEDHEALTHCARE INSURANCE
COMPANY,

Defendants.

Case No.

**COMPLAINT**

19
20
21
22
23
24
25
26
27
28

Plaintiff Sarah Taylor ("Plaintiff"), a pseudonym,[1] complains as follows on her own behalf, based on the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances by herself and her undersigned counsel, against Defendants United Behavioral Health ("UBH") and UnitedHealthcare Insurance Company ("UHIC"):

**INTRODUCTION**

1.      This case arises from Defendant UBH's wrongful decision to deny coverage for substance use services at a residential treatment center for Plaintiff.

2.      At all relevant times, UBH was the behavioral health administrator for Plaintiff's fully-insured, employer-sponsored health plan, which was issued by UHIC.

3.      Plaintiff, who was 22 years old during the relevant time period, suffered from anxiety and alcohol use disorders. Despite her prior attempts at outpatient treatment, including counseling and psychopharmacologic care, she could not refrain from alcohol, blacked out over 30 times, was sexually exploited, and was repeatedly hospitalized for intoxication.

4.      At all relevant times, Plaintiff's address of record with Defendants was in Edwards, Colorado.

5.      At all relevant times, Defendants' network did not include any intermediate behavioral health care providers (such as residential treatment, partial hospitalization, and intensive outpatient treatment) that were geographically accessible to Plaintiff in Edwards, Colorado.

6.      On April 26, 2019, due to her ongoing alcohol abuse, blackouts, sexual exploitation, co-occurring anxiety disorder, and lack of sober supports, and just days shy of her college graduation, Plaintiff sought clinically-managed residential treatment at The Richard J. Caron Foundation ("Caron") in Pennsylvania. Plaintiff selected Caron, a not-for-profit, CARF-accredited, out-of-network facility, due to her lack of local treatment options.

---

[1] Once Defendants are served with this Complaint and appear, Plaintiff will file an administrative motion to proceed under a pseudonym in accordance with Civil L.R. 7-11, which will be accompanied by "a stipulation under Civil L.R. 7-12 or . . . a declaration that explains why a stipulation could not be obtained." Undersigned counsel anticipates, based on his experience with Defendants in similar cases, that Plaintiff will obtain Defendants' consent to proceed under a pseudonym.

7.     Plaintiff's health plan required UBH to make medical necessity determinations in a manner consistent with generally accepted standards of medical practice.

8.     UBH initially recognized the medical necessity of Plaintiff's clinically-managed residential treatment at Caron and approved coverage under *The ASAM Criteria* (3rd Edition) ("ASAM"), which UBH has adopted as its standard medical necessity criteria for substance use disorders.

9.     Shortly after Plaintiff admitted to Caron, UBH's utilization reviewers expressly noted the geographic unavailability of in-network, intensive outpatient treatment and partial hospitalization facilities for Plaintiff near Edwards, Colorado.

10.     Incredibly, despite UBH's awareness that Plaintiff lacked insight into her alcoholism and was not yet agreeable to abstinence, that Plaintiff lacked sober housing, and that Plaintiff lacked geographically accessible, intermediate behavioral health treatment options, UBH callously denied further coverage as of May 9, 2019, stating that her care could continue at an illusory intensive outpatient treatment level of care.

11.     UBH's conduct can only be fully understood by appreciating how reluctantly it adopted ASAM. UBH adopted ASAM in early 2019, a month before Chief Magistrate Judge Joseph C. Spero's post-trial decision in *Wit v. United Behavioral Health*, No. 14-cv-02346, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019). There, Judge Spero found that UBH had breached its ERISA fiduciary duties by adopting its own, pervasively-flawed, Level of Care Guidelines for making medical necessity determinations under ERISA-governed plans, and that UBH abused its discretion when it used those guidelines to deny coverage to the *Wit* class members. Judge Spero found that UBH's Level of Care Guidelines violated the *Wit* class members' plans because they were inconsistent with generally accepted standards of medical practice.

12.     Judge Spero explained that the generally accepted standards of medical practice in the behavioral health field include the following principles:

a)  "[E]ffective treatment requires treatment of the individual's underlying condition and is not limited to alleviation of the individual's current symptoms;"

-2-

b)   "[E]ffective treatment requires treatment of co-occurring behavioral health disorders and/or medical conditions in a coordinated manner that considers the interactions of the disorders and conditions and their implications for determining the appropriate level of care;"

c)   "[P]atients should receive treatment for mental health and substance use disorders at the least intensive and restrictive level of care that is safe and effective . . . the fact that a lower level of care is less restrictive or intensive does not justify selecting that level if it is also expected to be less effective. Placement in a less restrictive environment is appropriate only if it is likely to be safe and just as effective as treatment at a higher level of care in addressing a patient's overall condition, including underlying and co-occurring conditions;"

d)   "[W]hen there is ambiguity as to the appropriate level of care, the practitioner should err on the side of caution by placing the patient in a higher level of care;"

e)   "[E]ffective treatment of mental health and substance use disorders includes services needed to maintain functioning or prevent deterioration;"

f)   "[T]he appropriate duration of treatment for behavioral health disorders is based on the individual needs of the patient; there is no specific limit on the duration of such treatment;" and

g)   "[T]he determination of the appropriate level of care for patients with mental health and/or substance use disorders should be made on the basis of a multidimensional assessment that takes into account a wide variety of information about the patient." *Id.* ¶¶ 71-81.

13.     Judge Spero found that the UBH Level of Care Guidelines in effect from 2011-2017 were "riddled with requirements that provided for narrower coverage than is consistent with generally accepted standards of care." Among other failings, those guidelines placed outsized emphasis on "stabilizing crises while ignoring the effective treatment of members' underlying conditions." *Id.* ¶ 82.

14.     Particularly notable, given the factual underpinnings of Plaintiff's claims here, is that UBH's guidelines included a troubling focus on acute symptoms, to the exclusion of consideration of the chronic severity of many underlying illnesses, including substance abuse. As Judge Spero found, "neither 'acute symptoms' nor 'acute changes' should be a mandatory prerequisite for coverage of outpatient, intensive outpatient or residential treatment." *Id.* ¶ 96.

15.     Additionally, Judge Spero concluded that UBH's decisions to implement its defective standards were improperly motivated by UBH's financial self-interest. Specifically, Judge Spero found that UBH delayed adopting ASAM solely due to concerns for its own bottom line:

> Most striking, however, was the obvious impact of financial considerations on UBH's decision making as to the adoption of the ASAM Criteria. UBH's refusal to adopt the ASAM Criteria was not based on any clinical justification . . . The **only** reason UBH declined to adopt the ASAM Criteria was that its Finance Department wouldn't sign off on the change. In other words, UBH's Finance Department had veto power with respect to the Guidelines and used it to prohibit even a change in the Guidelines that all of its clinicians had recommended. This evidence establishes that UBH has a conflict of interest that has had a significant impact on decision-making as to the development of the Guidelines. *Id.* ¶ 212 (citations omitted and emphasis added).

16.     Judge Spero's liability ruling highlighted that UBH had taken a particularly parsimonious approach to residential substance use treatment by failing to account for coverage criteria specific to clinically-managed (rather than more intensive, medically-monitored inpatient) levels of care:

> In its post-trial brief, UBH essentially conceded that its Guidelines do not provide for coverage of residential treatment at ASAM levels 3.1, 3.3 or 3.5. See UBH Post-Trial Brief at 91-93. Instead, UBH offers a hodge-podge of excuses for this omission, none of which is convincing. Id. ¶ 212.

17.     In light of these defects in UBH's Level of Care Guidelines, Judge Spero determined that using those guidelines to determine whether services were consistent with generally accepted standards of medical practice was "unreasonable and an abuse of discretion because they were more restrictive than generally accepted standards of care." *Id.* ¶ 212.

18.     Insofar as it is relevant to this case, UBH adopted ASAM as its standard criteria for making medical necessity determinations for adults with substance use disorders. In practice, however, the changes were superficial, as UBH feigned application of ASAM while continuing to adhere to the myopic focus on acuity that had long characterized its approach to utilization management.

19.     With respect to Plaintiff's claims, UBH denied her request for continued coverage of clinically-managed residential treatment based on ASAM criteria applicable to more intensive, medically-monitored  inpatient care (where a medical focus on acuity necessarily predominates) and failed to genuinely account for a host of multi-dimensional concerns, including the chronic severity of Plaintiff's condition, her lack of insight, her ambivalent motivation, her lack of sober supports, and her lack of access to UBH's recommended step-down level of care.

20.     Rather than continue to cover residential treatment, which provides boarding and could therefore actually accommodate and treat Plaintiff, UBH self-servingly recommended intensive outpatient treatment, a geographically unavailable level of outpatient care. To obtain intensive outpatient treatment, Plaintiff would have had to relocate from her parents' home, privately shoulder additional housing costs, and endure the financial and emotional pressures of living in an unfamiliar city without adequate coping skills and sober social supports. Thus, UBH proposed a treatment alternative that was not only less effective, but also entirely illusory. As an alternative, UBH failed to offer to offset the cost of her continued residential treatment with an amount equal to what intensive outpatient treatment would have cost. Instead, when presented with Plaintiff's post-service residential treatment claims (for the unauthorized period from May 9, 2019 through May 24, 2019), UBH simply denied reimbursement altogether.

## THE PARTIES

21.     Plaintiff was a beneficiary of a large group, non-grandfathered employee welfare benefit plan sponsored by her father's employer (the "Plan" or "Plaintiff's Plan"). At all times relevant to this complaint, Plaintiff's address of record with Defendants was in Edwards, Colorado.

22.     Defendant UnitedHealthcare Insurance Company ("UHIC"), a subsidiary of UnitedHealth Group ("UHG" and, together with Defendant United Behavioral Health, "United") is the underwriter of and claims administrator for Plaintiff's Plan and is based in Hartford, Connecticut. UHIC issued the Certificate of Coverage for the Plan and is vested with the fiduciary responsibility to make all final and binding coverage determinations under the Plan.

23.     Defendant UHIC delegated responsibility for making all final and binding coverage determinations for mental health and substance use disorder benefits under Plaintiff's Plan to its corporate affiliate, Defendant United Behavioral Health ("UBH"), which also bears the financial risk for mental health claims with respect to fully-insured plans such as Plaintiff's.

24.     Defendant United Behavioral Health ("UBH"), which operates under the brand name, "Optum," is a corporation organized under California law, with its principal place of business in San Francisco, California. UBH bears the financial risk for the fully-insured behavioral health claims that it adjudicates.

25.     Plaintiff's Plan names UHIC as the "Claims Fiduciary." In addition, because of the role that UHIC plays in delegating its responsibility for final and binding coverage determinations, and the role that UBH plays in making final and binding coverage determinations under Plaintiff's Plan, both Defendants are functional fiduciaries under ERISA, 29 U.S.C. § 1104. As ERISA fiduciaries, UHIC and UBH owe duties of loyalty to plan participants and beneficiaries, which require them to act "solely in the interests of the participants and beneficiaries" of the plans they administer and for the "exclusive purpose" of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the plans. 29 U.S.C. § 1104(a)(1)(A). UHIC and UBH also owe plan participants and beneficiaries duties of care, which require them to act with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans, so long as such terms are consistent with ERISA. *Id.* § 1104(a)(1)(B), (D).

**JURISDICTION AND VENUE**

26.     Defendant UBH's actions in administering employer-sponsored health care plans, including exercising discretion with respect to determinations of coverage for Plaintiff's Plan, are governed by ERISA, 29 U.S.C. §§ 1001–1461. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

27.     Personal jurisdiction over Defendant UBH exists with this Court. UBH is a corporation organized under California law with significant contacts in California.

28.     Venue is appropriate in this District. Defendant UBH is headquartered in this District, administers plans here, and conducts significant operations here.

## INTRADISTRICT ASSIGNMENT

29.     This case should be assigned to the San Francisco Division of this Court because Defendant UBH is headquartered in San Francisco, administers plans here, and conducts significant operations here.

## STATEMENT OF FACTS

### I.     Plaintiffs' Plan

30.     Plaintiff's Plan is a fully-insured plan issued by UHIC and governed by ERISA. UHIC is the named "Claims Fiduciary."

31.     Plaintiff's Plan covers treatment for sickness, injury, mental illness, and substance use disorders.

32.     Residential treatment is a covered benefit under the Plan. The Plan does not limit coverage for residential treatment to emergency, short-term or crisis stabilization services. The Plan broadly defines "residential treatment" as being "under the active participation and direction of a Physician," and expressly indicates that a "[a]ny podiatrist, dentist, *psychologist*, chiropractor, optometrist, *or other provider who acts within the scope of his or her license* will be considered on the same basis as a Physician." Thus, the Plan provides benefits for residential treatment that is medically-monitored (*i.e.,* by medical doctors) or clinically-managed (*i.e.,* by licensed psychologists, social workers, etc.).

33.     Plaintiff's Plan provides that Defendants will pay benefits subject to the in-network schedule when covered health care services are received from out-of-network providers if such services are not available from network providers.

34.     As the behavioral health administrator for Plaintiff's Plan, UBH exercises its discretion to interpret Plan terms, limitations, and exclusions, to make determinations of coverage for behavioral health services, and to cause any resulting benefit payments to be made by the Plan.

-7-

Under the terms of Plaintiff's Plan, an essential condition of coverage is that covered services must be consistent with generally accepted standards of medical practice.

35.     Therefore, one of the essential determinations UBH must make when reviewing claims for coverage under the Plan is whether the services for which coverage is requested are consistent with generally accepted standards of medical practice. As described below, UBH purported to adopt ASAM as its standard criteria for making medical necessity determinations—*i.e.*, whether the services for which coverage is requested are consistent with generally accepted standards of medical practice—but in Plaintiff's case, UBH failed to apply ASAM faithfully.

36.     Although UBH, as claims administrator and ERISA fiduciary, owes the participants and beneficiaries of Plaintiff's Plan a fiduciary duty to interpret the Plan reasonably, including when applying criteria to determine whether services are consistent with generally accepted standards of medical practice, and although it was UBH's duty to use due care and act prudently and solely in the interests of the Plan participants and beneficiaries when doing so, UBH's conduct demonstrates that it has faithlessly adopted and applied ASAM in name only, by failing to actually apply the ASAM criteria applicable to clinically-managed residential substance use treatment and by failing to adhere to the generally accepted standards of medical practice reflected in ASAM.

## II.     Generally Accepted Standards of Medical Practice

37.     Generally accepted standards of medical practice, in the context of behavioral health services, are the standards that have achieved widespread acceptance among behavioral health professionals.

38.     In the area of behavioral health treatment, there is a continuum of intensity at which services are delivered, ranging from outpatient services to higher levels of service intensity like intensive outpatient programs, partial hospitalization, residential treatment, and inpatient hospitalization.

39.      As explained by Judge Spero:

The next level of intensity below inpatient hospitalization is residential treatment. Residential treatment is for individuals who do not pose an imminent risk of serious harm to self or others (i.e., who do not need inpatient hospitalization), but rather,

"because of specific functional limitations, need safe and stable living environments and 24-hour care." Trial Ex. 662-0240 (ASAM Criteria) (describing generally ASAM Level 3 programs); see also Trial Ex. 634-0011 (APA Practice Guidelines for Treatment of Patients with Substance Use Disorders) ("Residential treatment is indicated for patients who do not meet the clinical criteria for hospitalization but whose lives and social interactions have come to focus predominantly on substance use, who lack sufficient social and vocational skills, and who lack substance-free social supports to maintain abstinence in an outpatient setting.") . . . At this level of care, treatment is not limited to addressing acute symptoms to achieve crisis stabilization; instead, it is designed to provide patients with an "opportunity to engage underlying chronic, recurrent, comorbid issues" so that they are able to "turn a corner" and move to a lower level of service intensity. Trial Tr. 489:7-14 (Plakun). *Id.* ¶ 67.

Residential treatment takes different forms. As reflected most explicitly in the ASAM Criteria, there are sub-levels of residential treatment, "on a continuum ranging from the least intensive residential services [level 3.1] to the most intensive medically monitored intensive inpatient services [level 3.7]." Trial Ex. 662-0240 (ASAM Criteria). Level 3.7 programs "provide a planned and structured regimen of 24-hour professionally directed evaluation, observation, medical monitoring, and addiction treatment in an inpatient setting." Trial Ex. 662-0290 (ASAM Criteria). Levels 3.1 through 3.5 are "clinically managed," which means that "on-site physician services are not required" but patients still "are in need of interventions directed by appropriately trained and credentialed addiction treatment staff." Trial Ex. 662-0241 (ASAM Criteria). *Id.* ¶ 64.

40.    According to ASAM, unlike "medically monitored" residential treatment, "clinically managed" treatment is typically of longer duration:

The term "clinically managed" is used to describe Level 3.1 through 3.5 programs and places emphasis on the therapeutic milieu. Individuals who are appropriately placed in the clinically managed levels of care have minimal problems with intoxication or withdrawal (Dimension 1) and few biomedical complications (Dimension 2), so on-site physician services are not required. Such individuals may have relatively stable problems in emotional, behavioral, and cognitive conditions (Dimension 3) . . . While the duration of treatment varies with the severity of an individual's illness and his or her response to treatment, the length of service in clinically managed Level 3 programs tends to be longer than in the more intensive medically monitored and medically managed levels of care.

Level 3.5 may also be provided by continued care in the program at which they received their Level 3.7 treatment, thus providing continuity of care . . . [A] Level 3.5 program may represent a "step down" for patients of a Level 3.7 program if their complications in Dimensions 1, 2, or 3 no longer require subacute medical services. However, the patient's problems in Dimensions 4, 5, and 6 warrant 24-hour structure and clinical services to facilitate initial recovery. (One way of

-9-

conceptualizing this level of service is as a Level 3.7 program without the intensive medical and nursing component.)

Longer exposure to treatment interventions is necessary for certain patients to acquire basic living skills and to master the application of coping and recovery skills. Such patients require the intensity and duration of treatment found in a Level 3.5 program to accomplish some of the tasks of habilitation in a temporary "home" that can imprint the features of a recovery environment.

All Level 3 programs serve individuals who, because of specific functional limitations, need safe and stable living environments and 24-hour care. This is needed to ***develop, practice, and/or demonstrate the recovery skills*** necessary so that patients do not immediately relapse . . .

The duration of treatment ***always*** depends on an individual's progress in ***acquiring basic living skills***. How long a person stays in a 24-hour treatment setting depends on his or her ability to ***apply and demonstrate*** coping and recovery skills, such that he or she doesn't immediately relapse . . .

41.     There are generally accepted standards of medical practice for matching patients with the level of care that is most appropriate and effective for treating their conditions.

42.     These generally accepted standards of medical practice are reflected in multiple sources, including peer-reviewed studies in academic journals, guidelines and materials distributed by government agencies, and consensus guidelines from professional organizations, including ASAM, described further below, which UBH adopted in early 2019 and purported to apply to Plaintiff's claims.

43.     Judge Spero also accurately set forth these generally accepted standards of medical practice in the *Wit* Findings of Fact and Conclusions of Law. *See* ¶ 12, *supra*.

### III.     ASAM

44.     As explained by Judge Spero:

The ASAM Criteria are the most widely accepted articulation of the standards of care for how to conduct a comprehensive multidimensional assessment of a patient with a substance related disorder, translate that into patient treatment needs and match those needs to the appropriate level of care. Trial Tr. 69:20-24 (Fishman) … The ASAM Criteria set for forth the "Six Dimensions of Multidimensional Assessment," establishing six "unique dimensions," which represent different life areas together impact any and all assessment, service planning, and level of care placement decisions. Trial Ex. 662-0064. ASAM uses this multidimensional

-10-

approach to "create a holistic, biopsychosocial assessment of an individual to be used for service planning and treatment across all services and levels of care." *Id.* The ASAM Criteria also describe a continuum of care, using a numbering system ranging from .5 (Early Intervention) to 4.0 (Medically Managed Intensive Inpatient Services). Trial Ex. 662-0127 to -0128 . . . *Id.* ¶ 58.

Under the ASAM Criteria, for example, the six dimensions that clinicians should consider are as follows: 1) Acute Intoxication and/or Withdrawal Potential; 2) Biomedical Conditions and Complications; 3) Emotional, Behavioral, or Cognitive Conditions and Complications; 4) Readiness to Change; 5) Relapse, Continued Use, or Continued Problem Potential; and 6) Recovery/Living Environment. Trial Ex. 662-0064 (ASAM Criteria). These criteria are not rigid requirements for making level of care determinations. Instead, each of the six dimensions is "assessed independently and receives its own risk rating." Trial Ex. 662-0076 (ASAM Criteria). These scores are then combined, so that lower scores in one dimension can be offset by higher scores in another. Further, ASAM instructs that "cross-dimensional interactions" should be considered, as these may increase or decrease the level of risk. Trial Ex. 662-0080 ("Being aware of cross-dimensional interactions, and the potential increase or decrease in overall risk they pose, can have a great effect on service planning and placement decisions."). *Id.* ¶ 80.

45.     ASAM expressly indicates that, "In general, when the criteria designate a treatment placement that is not available, a strategy must be crafted that gives the patient the needed services in another placement or combination of placements. The paramount objective should be safety and effectiveness, ***which usually requires opting for a program of greater intensity than the placement criteria indicate***." *Id.* ¶ 74.

## IV.     Plaintiff Required Residential Treatment and Sought Coverage from UBH Pursuant to Her Plan

46.     On April 26, 2019, just days shy of her college graduation, Plaintiff sought residential treatment due to her severe alcohol abuse, numerous blackouts and sexual exploitation, a co-occurring anxiety disorder, and lack of sober supports. Plaintiff selected The Richard J. Caron Foundation, a non-for-profit, CARF-accredited, out-of-network facility in Pennsylvania, due to a lack of geographically-accessible treatment options near her home.

47.     On April 27, 2019, following an admissions review with Caron, UBH case manager, Juanita Perry-Hoffman, noted that Plaintiff's condition satisfied admission criteria for clinically-managed, high intensity residential treatment (ASAM Level 3.5).

48.     Although Caron sought authorization from UBH for 30 days of residential treatment, Ms. Perry-Hoffman unilaterally modified Caron's preauthorization request and parsimoniously approved only 4 days of coverage. UBH's accreditation (by NCQA and URAC) and ERISA, however, did not permit Ms. Perry-Hoffman, a non-physician, to unilaterally modify Caron's preauthorization request and to thereby deny 26 days of coverage without offering due process (*i.e.*, administrative appeal) rights and without first expediting the preauthorization request to a peer reviewer—in this case, a UBH medical director who was board-certified in psychiatry and/or addictionology.

49.     On April 29, 2019, following a concurrent care review with Caron, Leah Graham, another UBH case manager, noted that:

> [Member] had been sent to the hospital due to high levels of alcohol (this happened more than once), so family did an intervention. Parents drink alcohol socially daily, and m[em]b[e]r may return to live with them until she starts her internship. She has been blacking out due to excessive drinking. Hx of trauma: death of friend due to a gunshot wound, the death of that friend's father (whom she was close to), has been taken advantage of sexually while under the influence. Hx of anxiety and suicidal ideation. Issues with food and spending.

> High anxiety, often doesn't know where it comes from. M[em]b[e]r lacks coping skills for anxiety. M[em]b[e]r reports cravings and urges to drink when feeling socially anxious. M[em]b[e]r has been given her first step prep, is working on a timeline for her use and identifying negative consequences of use, as well as identifying triggers. M[em]b[e]r does not yet identify as an addict/alcoholic.

50.     Despite Caron's coverage request for  an  additional 10 days, Ms. Graham only authorized 4 days "in an effort to expedite needed care"—this time applying the more stringent ASAM criteria for medically-monitored (rather than clinically-managed) residential treatment, without any indication that Caron actually increased or sought to increase Plaintiff's treatment intensity. In practice, Ms. Graham's push to approve fewer days of coverage than requested was

-12-

part of UBH's corporate strategy to coerce providers to accept less care than medically necessary so as to minimize UBH's benefit expense. This abusive pattern of behavioral health claims administration was expressly identified in a March 20, 2020 market conduct examination of UBH undertaken by the State of Rhode Island Office of the Health Insurance Commissioner:[2]

> United Behavioral Health was an operating division within Optum, Inc. ("Optum"). Since the examination period, Optum has reorganized so that Optum is now directly responsible for performance of the utilization review function for behavioral health services for all health insurance subsidiaries operating under the parental control of UnitedHealth Group, the corporate entity that also controls Optum. UnitedHealth Group is also the corporate entity that controls United RI. For purposes of this Examination Report, United Behavioral Health and Optum will both be referred to as "Optum" . . .

> Short-term, frequent concurrent reviews; voluntary modification agreements.

> •    Optum engaged in a practice of short-term, frequent concurrent reviews, and recommended a shorter length of stay or lower level of care than requested by the treating provider, without a clinical basis for the short term, frequent concurrent reviews, or for the recommendation of a shorter length of stay or a lower level of care.

> •    Optum standard protocols record pro forma attestations or verifications that the provider has agreed to a modification in the provider's request for treatment approval, without credible or sufficient evidence that the provider's agreement was voluntary.

> Coercive utilization review practices. Optum engaged in coercive utilization review practices. For example:

> •    Optum's standard protocols suggest that provider requests for authorized treatment will be delayed unless the provider agrees to a shorter length of stay or lower level of care . . .

> •    Optum told providers that authorization for continued treatment can begin immediately if the provider agrees to a reduced length of stay or lower level of care; otherwise, a new and time-consuming pre-certification process would need to be conducted . . .

51.    On May 3, 2019, following another concurrent care review with Caron, Ms. Graham noted that Plaintiff continued to struggle with anxiety, was unsure if she had an actual addiction

---

[2] http://www.ohic.ri.gov/documents/2020/March/United/UHC%20MCE_033020_WEBSITE.pdf

(and therefore continued to minimize the severity of her illness), was binging at nights, and that family sessions had yet to occur. Ms. Graham also noted that "where m[em]b[e]r will live upon discharge is unclear at this time" and "barriers to discharge" included that Plaintiff "[w]ould benefit from learning about the disease concept and developing coping strategies for recovery and for anxiety." Again, in lieu of authorizing 10 additional days, as requested, Ms. Graham approved only 3, self-servingly stating that "this is not a denial but a change in the requested number of days/units or level of care." In the same call, and in the absence of Plaintiff having acquired a sufficient understanding of her illness and consistently applying coping skills, Ms. Graham "advised facility that we would likely expect a DC [discharge]/step down at next review."

52.     On May 6, 2019, Ms. Graham staffed Plaintiff's case with UBH medical director, Lee Becker, and advised him that UBH "was unable to find any INN [in-network] IOP [intensive outpatient] facilities within geo[graphic] access." According to ASAM, intensive outpatient treatment offers "[a] *minimum* of 9 hours per week for adults . . . of skilled treatment services. Such services may include individual and group counseling, medication management, family therapy, educational groups, occupational and recreational therapy, and other therapies. Services are provided in amounts, frequencies, and intensities appropriate to the objectives of the treatment plan."

53.     When confronted with the reality of UBH's non-existent network of intensive outpatient services near Plaintiff's home, Dr. Becker instructed Ms. Graham to "find out whether fac[ility] can call parents to find out if they are planning to take m[em]b[e]r back home to CO or if they are going to fund her to stay in NY? "If m[em]b[e]r is returning to CO, are there MAT [medication assisted therapy] providers INN [in-network] within geo[graphic] access and an OP [outpatient] provider who can see her a couple times a week?"

54.     Thus, rather than adhere to ASAM and err on the side of treatment efficacy and caution by offering Plaintiff a suitable course of residential treatment that subsumed the intensity of intensive outpatient services, Dr. Becker suggested that Plaintiff could simply make do with outpatient therapy "a couple times a week" and with medication assisted alcohol abuse treatment

-14-

(which had not been prescribed). None of these options would have even remotely approached the 9-hour per week *minimum* clinical structure offered by an intensive outpatient program.

55.     Following yet another call with Caron on May 8, 2019, Ms. Graham again noted that "[t]here are no INN [in-network] PHP [partial hospital] or IOP [intensive outpatient] providers within geo[graphic] access for m[em]b[e]r's CO address." She also noted that Caron "reported today that m[em]b[e]r plans to return to NYC but *she does not have an address*, so FBC [facility-based coordinator] cannot do a geo[graphic] access search for INN [in-network] providers." Although Ms. Graham was clearly aware that Plaintiff did not have an address in New York, she failed to note that Plaintiff would not have an address in New York until her internship began in June 2019 and that, until then, Plaintiff had nowhere else to reside other than with her parents in Colorado. Although a UBH medical director, Benito Marty, subsequently "advised obtaining m[em]b[e]r's address in NYC so we can do a search for INN [in-network] providers," Ms. Graham failed to obtain this information, and without offering Caron the opportunity to participate in a live peer review with a UBH medical director (let alone within a 72-hour time frame, as required by ERISA for urgent concurrent care claims), UBH scheduled a May 13, 2019 "record review" by Dr. Marty with "no provider outreach." UBH's failure to timely process requests for coverage and to communicate with providers was also expressly called out by the Rhode Island market conduct examination:

- Optum schedules provider communications and peer to peer review consultations within unrealistic timeframes, forcing providers to choose between attending to their other professional obligations, and responding to Optum. Provider communications and consultations are less likely to occur in these circumstances . . .

- Optum engages in improper peer to peer consultation practices: (i) by scheduling inadequate and unreasonable time for provider consultations, (ii) by asserting that a peer to peer consultation occurred when it is more likely than not that the consultation did not occur or did not occur before the denial decision was made, and (iii) by failing to properly consider the provider's rationale for the treatment approval request.

56.     In reviewing Plaintiff's ongoing care, Dr. Marty, like Ms. Graham, also applied the more restrictive ASAM criteria for medically monitored (rather than clinically managed) residential treatment. While observing that Plaintiff "is noted to have limited insight into her alcohol use and is not agreeable to complete abstinence," Dr. Marty concluded that "care can be safely and effectively continued in a substance use intensive outpatient setting, with community resources such as sober living and 12 step programming," without at all accounting for Plaintiff's near certain risk of relapse, pattern of severe adverse consequences from alcohol abuse, the irrefutable fact that UBH had not identified any intermediate behavioral health treatment options for Plaintiff in Colorado, and without any concern for when Plaintiff could secure sober housing in New York. This callous disregard for patient welfare was also expressly noted by the Rhode Island market conduct examination of UBH:

Inappropriate coverage decisions for discharge.

•     Optum recommends a denial of coverage for a continued care/stay indicating the patient was appropriate for discharge notwithstanding that the lower level of care is not available.

Continuity of care and transition of care; safety and welfare.

•     Optum failed to adequately consider the patient's need for continuity and transition of care, and for the patient's safety and welfare when denying coverage requests for treatment approval.

57.     Thirteen minutes after Dr. Marty's record review and initial adverse determination, Ms. Graham completed another concurrent review with Caron and noted that "[a]s of 5/6 m[em]b[e]r had not yet completed any assignments, but is working on them. M[em]b[e]r reports her current supports are 'toxic,' and has no sober supports." Ms. Graham also noted that Caron continued to recommend residential treatment, since Plaintiff had not yet come to accept her condition or commit to abstinence.

58.     By letter dated May 13, 2019, Dr. Marty informed Plaintiff that:

United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance use services that are provided to UBH members . . .

-16-

Based on the criteria for ASAM Level 3.7 Medically Monitored Intensive Inpatient Services, it is my determination that no authorization can be provided from 05/09/19 and forward . . .

You are not having issues with significant withdrawals and you were not started on any medication assisted treatment that requires 24 hour residential rehabilitation monitoring or management. You are medically stable. You are not reported to have any mental health issues that prevent you from continuing treatment in a less intensive setting. You have been involved in treatment where you have had education and exposure to principles of Substance Use Disorder, relapse prevention, triggers, abstinence/sobriety and the use of community sober supports. You will need continued support, monitoring and assistance with maintaining abstinence . . . you could continue care in a Substance Use Intensive Outpatient Setting, with community resources such as sober living and 12 step programming . . .

This determination does not mean that you do not require additional health care, or that you need to be discharged. Decisions about continuation of treatment should be made by you and the provider.

59.     Apart from noting Plaintiff's lack of withdrawal and medical complications, which are not prerequisites for clinically managed residential treatment, Dr. Marty conspicuously disregarded Plaintiff's lack of sober supports and the obvious non-availability of intensive outpatient treatment within geographic access to Plaintiff's home in Colorado. Additionally, Dr. Marty's adverse determination letter reflected UBH's superficial, therapeutically-bereft view of residential treatment merely being about "education and exposure to *principles* of substance use disorder," rather than the *actual* acquisition of insight and adaptive coping skills that can only come with sufficient clinical immersion.

60.     Given Caron's continued recommendation for residential treatment due to Plaintiff's lack of insight into her condition (including triggers and severe adverse consequences), risk of relapse, lack of a sober living environment, and lack of any intermediate behavioral health care options in Edwards, Colorado, Plaintiff remained at Caron through May 24, 2019 and incurred unreimbursed treatment costs.

61.     On July 25, 2019, Plaintiff appealed UBH's coverage denial for residential treatment at Caron from May 9, 2019 through May 24, 2019. Plaintiff's appeal challenged UBH's reliance

-17-

on ASAM criteria for medically monitored inpatient treatment (ASAM Level 3.7) rather than for clinically managed residential treatment (ASAM Levels 3.1-3.5), and called out UBH on its failure to approve residential coverage for anything less than acute crises (demarcated, for example, by withdrawal and acute medical conditions). Additionally, Plaintiff chronicled her multiple hospitalizations due to substance abuse and numerous (over thirty) blackouts, her failed prior outpatient treatments, including most recently at the University of Michigan Addiction Treatment Center—despite the additional support of the University of Michigan Collegiate Recovery Program since her sophomore year.

62.     Among other treatment records, Plaintiff enclosed a clinical assessment from Joseph Garbely, Caron's medical director.[3] Dr. Garbely is the chairman of the Physician in Training Committee of ASAM, an ex-officio member of the ASAM Board, and a distinguished Fellow of ASAM. Dr. Garbely received his board certifications through the American Board of Preventative Medicine, Addiction Medicine Subspecialty; the American Board of Internal Medicine; the American Board of Psychiatry and Neurology; and the American Board of Addiction Medicine. Dr. Garbley wrote that:

> It is my medical opinion that beyond a reasonable doubt, this admission was medically necessary. Due to your limited education of addiction and process of relapse, it was vital that you receive structured, monitored treatment under one treatment episode, especially when motivated and asking for help.

> Your pattern of substance dependence evidenced medical necessity. The addiction had impacted your functioning and judgment. You required 24-hour supervision and structured program to promote progress through the stages of change. You had not related many of your problems to substance use or understood how to start making the changes needed, and thus were in need of residential treatment. The lack of monitoring and supervision between treatment encounters at less intensive levels of care would not have allowed you the time to focus on identifying your problems or consequences.

> You did have potential for continued use, increased use, and relapse if the admission did not occur to Caron Treatment Centers. Inpatient treatment and structured programmatic milieu were necessary to develop recovery skills that were

---

[3] https://www.caron.org/about-caron/our-team/joseph-garbely

not yet sufficient to overcome triggers, cravings, family stressors, and internal triggers . . .

63.     Additional, attached records from Caron, including a May 8, 2019 progress note, reflected that Plaintiff "intended to live in an apartment in New York City, however, [was] uncertain about whether or not she will proceed to do that due to her roommate actively abusing alcohol and presenting with symptoms of disordered eating. Relapse potential surrounding a recovery environment with this individual was discussed and [Plaintiff] was encouraged to continue exploring alternative options regarding housing." A May 9, 2019 progress note, including a multi-dimensional ASAM assessment supporting continued residential treatment, further noted that, "At the present time, she does not have housing secured in the NYC area as she reports her projected roommate actively abuses alcohol and increases relapse potential." A May 16, 2019 progress note, including a multi-dimensional ASAM assessment supporting continued residential treatment, reflected Plaintiff's "high risk of relapse should she proceed with her NYC apartment as planned. This is indicated by her limited coping skills to manage mental health concerns, unstable recovery environment, and limited relapse prevention skills to manage triggers and relapse behaviors." Caron's discharge summary further noted that Plaintiff "[met four out of six ASAM criteria for Level III inpatient treatment along dimensions three, four, five, and six" and that Plaintiff "does not have a sober support system for a move to [New York City]."

64.     Without requesting Plaintiff to resubmit a missing page from her July 25, 2019 appeal letter that UBH received, and contrary to the information within UBH's possession, by letter dated August 30, 2019, UBH medical director Edward Collopy denied Plaintiff's first-level appeal concerning dates of service May 9, 2019 through May 24, 2019. Dr. Collopy's boilerplate letter stated that:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance use services that are provided to UBH members . . .
>
> As requested, I have completed an appeal/grievance review on a request we received 07/31/2019. This review included an examination of the following

-19-

information: appeal letter, claims review and case documentation. After fully investigating the substance of the appeal/grievance, including all aspects of clinical care involved in this treatment episode. I have determined that benefit coverage is not available for the following reason(s):

You were admitted for substance use treatment. Using the ASAM Criteria: Treatment Criteria for Addictive, Substance-Related, and Co-Occurring Conditions, Third Edition (The ASAM Criteria), we reviewed a request to continue benefit coverage at the ASAM residential rehabilitation Level of Care.

After reviewing the medical records, you made good progress and your condition no longer required 24 hour monitoring in a residential setting.

You were not reported to have any mental health issues that prevented you from continuing treatment in a less intensive setting.

You were not reporting thoughts of hurting yourself or others.
You had a sober living environment available to you.

You were involved in treatment where you have had education and exposure to principles of substance use disorder, relapse prevention, triggers, abstinence/sobriety and the use of community sober supports.

You needed continued support, monitoring and assistance with maintaining abstinence . . . you could have continued care at the ASAM intensive outpatient level of care and with sober support groups.

65.     Contrary to generally accepted standards of medical practice, Dr. Collopy, like Dr. Marty, plainly ignored that meaningful care is not a simple matter of "education and exposure to *principles* of substance use disorder"—particularly for ambivalent young adults who require sustained immersion in treatment to accept their condition and to develop and apply effective coping strategies that would preclude certain relapse. Additionally, Dr. Collopy's threadbare assertion that, by May 9, 2019, Plaintiff had "made good progress," was not only implausible given the hollow metric for progress that he set, but it was also plainly contradicted by the clinical record. Furthermore, despite being admonished not to apply criteria applicable to medically monitored inpatient care, Dr. Collopy improperly focused on the absence of acute mental health risks ("thoughts of hurting yourself or others") as a basis for denying coverage for clinically managed residential treatment. Finally, Dr. Collopy's assertions that Plaintiff had an available sober living

-20-

environment and ready access to intensive outpatient treatment were patently false, given that as of May 9, 2019, the effective date of UBH's adverse determination, Plaintiff's *only* readily available sober living environment and access to intermediate behavioral health care were at Caron. (The latter fact is fatal to UBH's adverse determinations irrespective of whether ASAM level 3.5 or 3.7 criteria had been used since ASAM required UBH to automatically approve coverage at a higher, available level of service intensity due to the geographic unavailability of intensive outpatient treatment.)

66.   In a final attempt to seek relief from UBH's callous coverage denials, Plaintiff submitted a second-level appeal on October 29, 2019, stating that:

Following another alcohol-related incident at the University of Michigan, I entered residential treatment at the Richard J. Caron Foundation on April 26, 2019. My lease in Ann Arbor ended on April 28, 2019, and thereafter, the only housing option available to me was with my parents, in Colorado.

Due to an internship in New York beginning on Monday, June 3, I sublet an apartment in New York as of June 1, 2019. Again, up until June 1, 2019, I did not have any housing option available to me other than with my parents in Colorado.

As UBH recognizes given its internal case management notes dated May 6, 2019 and May 8, 2019, there are no intensive outpatient and partial hospitalization programs within geographic access of my parents' residence in Colorado. Additionally, my parents consume alcohol, which is triggering for someone in early recovery.

When UBH denied further residential treatment at Caron on May 13, 2019, it knew that I did not have alternate housing outside Colorado, that there were no outpatient treatment alternatives within geographic access in Colorado, and that my parents consumed alcohol. Despite acknowledging in its adverse determination letters that I required "continued support, monitoring and assistance with maintaining abstinence," UBH lied when it also represented that I "could continue care in a Substance Use Intensive Outpatient Setting" because it kn[e]w that option was not open to me.

Given these irrefutable facts and that generally accepted standards of care, including those reflected in *The ASAM Criteria*, required UBH to err on the side of safety and efficacy rather than on the *illusory* premise that less intensive services were theoretically appropriate, UBH must approve coverage for the above-referenced residential treatment. *See* March 4, 2019 "Findings of Fact and Conclusions of Law," *Wit v. United Behavioral Health*: "In general, the approach is, *if the most effective level of care is not available* or there's a gray area between

two levels of care, one should take the conservative position and round up, as it were, or go to the next highest level of care."

67.     Although UBH was obligated to consider and respond to the evidence and arguments submitted by Plaintiff with each of her appeals, on November 25, 2019, UBH medical director Kenneth Fischer issued a "Final Adverse Determination" letter that categorically failed to address Plaintiff's contentions. Like his colleagues, Dr. Fischer subjected Plaintiff's claim to the more restrictive ASAM criteria for medically monitored inpatient treatment instead of applying ASAM criteria for the clinically managed residential care that Plaintiff actually received. Therefore, like his colleagues, Dr. Fischer myopically focused on acuity (demarcated by withdrawal, medical instability, and psychiatric risk of harm) while paying lip-service to Plaintiff's treatment ambivalence, risk of relapse, lack of sober housing, and lack of geographically accessible intermediate behavioral health care. Perversely, unlike Dr. Fischer's final adverse determination letter to Plaintiff, his private case notes actually acknowledged that as of May 9, 2019, the effective date of UBH's coverage denial, Plaintiff was resistant (psychologically and financially) to Caron's post-discharge recommendations for sober housing, such that she necessarily lacked sufficient insight about her condition and triggers, was highly vulnerable to relapse, lacked adequate internal motivation, and had not secured stable housing. Nevertheless, rather than attempt to remedy UBH's defective coverage determinations in this case, Dr. Fischer cemented them.

## V.     UBH Violated ERISA and the Plan's Terms

68.     In light of its central role in administering claims for coverage of mental health and substance abuse disorder treatment, UBH is an ERISA fiduciary as defined by 29 U.S.C. § 1104(a). As such, UBH owes a duty of loyalty to Plan participants and beneficiaries which requires it to discharge its duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the plan. UBH also owes plan participants and beneficiaries a duty of care, which requires it to act with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans, so long as such terms are consistent with ERISA. By

-22-

applying coverage criteria that were inapplicable to the clinically-managed level of care that Plaintiff actually received and by failing to make coverage determinations in a manner consistent with generally accepted standards of medical practice, recommending continued treatment at an illusory level of care, and failing to authorize benefits at the in-network level due to UBH's network inadequacy, UBH violated its fiduciary duties and the terms of Plaintiff's Plan.

**COUNT I**
**Claim for Benefits Due (Against Both Defendants)**

69.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

70.     Plaintiff brings this Count pursuant to 29 U.S.C. § 1132(a)(1)(B).

71.     UHIC is the underwriter of Plaintiffs' Plan and is the entity ultimately responsible for paying benefits due under the Plan.

72.     UHIC delegated to UBH its responsibility under Plaintiffs' Plan to make coverage determinations with respect to mental health services. UBH also assumed the financial risk for benefit expense under Plaintiff's fully-insured Plan.

73.     UBH wrongfully denied the requests for coverage of residential treatment submitted by Plaintiff, at least in part, by applying coverage criteria that were inapplicable to the clinically-managed residential level of care that Plaintiff actually received, by failing to make coverage determinations in a manner consistent with generally accepted standards of medical practice, and by failing to authorize benefits at the in-network level due to UBH's network inadequacy. UBH's wrongful denials of coverage, and UHIC's resulting failure to reimburse Plaintiffs for these services, endangered Plaintiff's health and welfare and subjected her to substantial, unreimbursed out-of-pocket expenses.

74.     Even assuming that Plaintiff did not require further residential treatment (which she did), UBH's adverse determinations violated Plaintiff's Plan because the adverse determinations presumed the availability of an outpatient level of care (intensive outpatient treatment) that was known to be geographically inaccessible to Plaintiff at the relevant time.

-23-

75.     Furthermore, Defendants failed to provide coverage for the services that UBH did deem medically necessary (*i.e.*, intensive outpatient treatment), for no other reason than that those services were obtained as part of treatment at a higher level of care (*i.e.*, residential treatment) that should have been covered anyway.

76.     Moreover, contrary to Plaintiffs' Plan, Defendants failed to reimburse Plaintiff's medically necessary care at the in-network benefit level due to their geographically inaccessible network of intensive outpatient, partial hospitalization, and residential treatment providers. This, too, resulted in Plaintiff being required to pay more than her share of covered claims.

77.     To remedy the improper denials of coverage alleged in this count, Plaintiff seeks an award of the benefits due under her Plan for the services she received, plus pre- and post-judgment interest.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in her favor against Defendants as follows:

A.     Awarding benefits due under the Plan for the services Plaintiff received, plus pre- and post- judgment interest;

B.     Awarding Plaintiff disbursements and expenses of this action, including reasonable attorneys' and expert fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. § 1132(g); and

C.     Granting such other and further relief as is just and proper in light of the evidence.

Dated:  August 28, 2020

/s/ Anthony F. Maul
Anthony F. Maul (Cal. Bar No. 314188)
THE MAUL FIRM, P.C.
101 Broadway, Suite 3A
Oakland, CA 94607
Tel: (510) 496-4477
Fax: (929) 900-1710
afmaul@maulfirm.com

Meiram Bendat (Cal. Bar No. 198884)
PSYCH-APPEAL, INC.
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690 Ext: 101
Fax: (888) 975-1957
mbendat@psych-appeal.com

*Counsel for Plaintiff*

-25-